United States Court of Appeals,

Eleventh Circuit.

No. 97-8915.

John DOE, Plaintiff-Appellee,

v.

DEKALB COUNTY SCHOOL DISTRICT, Defendant-Appellant.

July 17, 1998.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:96-cv-2313-RCF), Richard C. Freeman, Judge.

Before ANDERSON and BIRCH, Circuit Judges, and PAINE[*], Senior District Judge.

BIRCH, Circuit Judge:

The Dekalb County School District (the "School District" or "District"), seeks to vacate a permanent injunction prohibiting it from transferring a teacher, John Doe, who is infected with HIV, the virus that causes AIDS. The School District wishes to transfer Doe from a classroom of children with severe behavioral disorders, because it fears that Doe might have blood-to-blood contact with one of his sometimes-violent students, thereby transmitting HIV. After conducting a bench trial, the district court granted Doe a permanent injunction under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* blocking his transfer. The School District, however, argues that the district court failed to make adequate findings of fact regarding the effect of Doe's illness on his qualifications and that Doe has not suffered an "adverse employment action." We REVERSE, VACATE the injunction, and REMAND for further proceedings.

I. BACKGROUND

---

[*]Honorable James C. Paine, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

The School District has three distinct levels of special education programs for children with significant behavioral disorders. First, the District maintains "interrelated" classrooms for students with mild disorders; the District "mainstreams" these students for most of each school day. Second, the District has "self-contained" classrooms for children who are too "disordered" to participate in the interrelated program. Third, the District operates "psychoeducation" classrooms for students with the most severe behavioral problems. From 1992 to 1995, John Doe was a teacher at the District's Shadow Rock Psychoeducational Center ("Shadow Rock").[1]

Children enrolled in the District's psychoeducation classes are often aggressive. As the District established at trial, these children frequently engage in acts of violence such as biting, hitting, scratching, and kicking. Some children also attempt to bring dangerous items such as razors to school or to attack their classmates or teachers with objects such as pencils. Because of these potential dangers, psychoeducation teachers must be able to physically restrain their pupils; for example, a psychoeducation teacher may have to "basket hold" several students each day. Often, these confrontations result in injuries to teachers. Although the number of scrapes and bruises suffered by teachers is unclear, psychoeducation teachers commonly file workman's compensation claims for significant injuries, and, at least once, a teacher has suffered a severe bite that drew blood and required medical attention.

In February 1995, Doe told Shadow Rock's principal that he was HIV-positive, and the principal in turn informed other school administrative personnel. Because District officials feared that violence and subsequent blood-to-blood contact between Doe and one of his psychoeducation

---

[1]Like the district court, we have allowed the plaintiff-appellee to proceed under the pseudonym "John Doe" in order to protect his privacy.

students might lead to transmission of HIV, the District transferred Doe to an "interrelated" classroom at a different school in April 1995. The parties dispute whether this transfer was "voluntary"; the District emphasizes that Doe signed a transfer form, while Doe argues that he had no choice but to sign and that he hoped that by doing so he might at least get to teach a "self-contained" rather than an "interrelated" class. While the district court's finding regarding this point is somewhat unclear, the court appears to have concluded that the transfer was involuntary. In any case, Doe spent the months after his transfer trying to convince the District to return him to his psychoeducation class, or, as an alternative, to assign him to a group of "self-contained" children.

Although Doe would prefer to teach a psychoeducational rather than an interrelated class, his transfer does not appear to represent a demotion. Doe's salary, benefits, and seniority all remain the same. Doe also enjoys the same relative level of prestige within the school system and the larger community. In addition, while Doe lacks a certificate from the State of Georgia in interrelated teaching, his transfer does not seem likely to render obsolete his investment in his own education. Although Doe's teaching experience has focused on psychoeducation, he does not have a particularly specialized educational background. Doe holds a bachelor's degree in psychology from New York University and a master's degree in special education from Georgia State University.

Doe, however, does have a Georgia certificate in psychoeducational teaching but not in interrelated instruction. To obtain an interrelated certificate, Doe would have to complete ten credit hours of coursework. In order to reduce any inconvenience this additional study might pose to Doe, the District has allowed Doe three years to become certified and promised to pay his educational expenses. In addition, the District has suggested that Doe might be able to count his ten hours concerning interrelated teaching toward the continuing education total that he would have to achieve

3

in any case to retain his current certification, though this point is not clear in the current record. Even without the interrelated certificate, Doe appears qualified to teach an interrelated class, since his interrelated pupils suffer from the same sort of disorders as his previous psychoeducational students—his new students are just easier to teach because they are less prone to misbehavior. As Doe concedes, his new interrelated position is less stressful. Significantly, Doe also agrees with the District that he will be more marketable as an interrelated teacher (once he obtains his certificate), with more long-term career opportunities, than he was before his transfer.

On August 1, 1995, Doe learned from the District's Executive Director of Personnel that he could not return to a psychoeducation setting or move to a self-contained classroom because of his HIV status. On August 3, 1995, Doe therefore timely filed a discrimination charge with the federal Equal Employment Opportunity Commission ("EEOC") alleging that the District was discriminating against him on the basis of his HIV disability. After the EEOC issued Doe a right-to-sue letter, he brought this action in the district court under both the ADA and the Vocational Rehabilitation Act ("VRA") 29 U.S.C. § 791 *et seq.*

From July 28 through July 31, 1997, the district court held a bench trial on Doe's claims. On August 1, 1997, the district court ruled in Doe's favor and issued a short written order containing terse findings of fact and conclusions of law. After noting that the parties agreed that Doe's HIV infection rendered him disabled, the district court found that "[t]he risk that plaintiff will transmit HIV to students with severe behavior disorders, including children who are prone to bite, is remote and theoretical." R4-59 at 2, ¶ 11. The court also found that Doe had suffered an adverse employment action. The district court, however, made no attempt to explain the basis for its conclusion regarding the risk of HIV transmission to Doe's psychoeducation students, nor did the

4

court offer any rationale for its assessment that Doe's transfer was "adverse."[2] Whatever its underlying reasoning, the district court issued a permanent injunction under the ADA requiring the School District to reinstate Doe as a psychoeducational instructor.[3]

## II. DISCUSSION

In order to prevail under the ADA, Doe must prove all three elements of his *prima facie* case by a preponderance of the evidence.[4] First, he must show that he has a disability.[5] Second, he must demonstrate that he is qualified to serve as a psychoeducation teacher, with or without some reasonable accommodation by the District, despite his disability. Third, he must show that he has suffered an adverse employment action because of his disability (*i.e.,* that he has suffered employment discrimination). *See Harris v. H & W Contracting Co.,* 102 F.3d 516, 519, 523-24 (11th Cir.1996) (discussing the elements of a *prima facie* case under the ADA).

---

[2]The district court did list three findings of fact elsewhere in its order that it apparently thought were relevant to its holding that Doe's transfer was adverse. First, the district court found that "Plaintiff is certified to teach children with behavior disorders, and teaching in this field has special meaning and significance to him." R4-59 at 1, ¶ 11. Second, the district court observed that "Plaintiff is not certified to teach in an interrelated program." *Id.* at 2, ¶ 7. Third, the district court stated that "Plaintiff did not wish to be moved from his classroom at Shadow Rock...." *Id.* at 2, ¶ 8.

[3]The district court did not separately discuss Doe's VRA claim.

[4]On appeal, Doe does not argue that we should read the VRA to provide him with any cause of action or form of relief that is unavailable under the ADA. In fact, Doe makes no arguments at all premised on the VRA. We, therefore, deem Doe's VRA claim to have been abandoned, and we discuss his claim as if it arose solely under the ADA. *See Allstate Ins. Co. v. Swann,* 27 F.3d 1539, 1542 (11th Cir.1994) (stating that issues not raised in a party's brief are considered abandoned).

[5]A person who is infected with HIV is "disabled" for purposes of the ADA, even if he has not developed AIDS. *See Bragdon v. Abbott,* --- U.S. ----, 118 S.Ct. 2196, --- L.Ed.2d ---- (1998).

The School District contends that the district court made two critical errors in applying this framework. First, the District argues that the court did not properly find or balance relevant safety factors regarding Doe's continued qualification for a psychoeducation position, as required by *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Second, the District maintains that its transfer of Doe was not an "adverse employment action." We review the district court's findings of fact for clear error and its analysis of law *de novo. See* Fed.R.Civ.P. 52(a); *Simmons v. Conger,* 86 F.3d 1080, 1084 (11th Cir.1996).[6] We address each of the District's contentions in turn.

A. WHETHER DOE IS QUALIFIED

In *Arline,* the Supreme Court considered whether a woman suffering from tuberculosis was otherwise qualified to be an elementary schoolteacher. *See generally Arline,* 480 U.S. 273, 107 S.Ct. 1123 (applying the VRA). Rather than establishing some arbitrary rule regarding the relevance of contagious disease to teaching qualifications, the Court insisted that district courts undertake "individualized inquiry" in each case. *Id.* at 287, 107 S.Ct. at 1130. This inquiry must include:

> (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties), and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

*Id.* at 288, 107 S.Ct. at 1131 (quoting Amicus Curiae Brief of the American Medical Association at 19). In making these findings, a district court "normally should defer to the reasonable medical judgments of public health officials." *Id.*

---

[6]The School District concedes that, if Doe is disabled, is otherwise qualified, and has suffered an adverse employment action, then a permanent injunction prohibiting Doe's transfer based on his HIV status would be appropriate.

Once a district court has made the necessary medical findings, it must weigh the statutory goal of ending disability-based discrimination against any legitimate concerns regarding "significant health and safety risks." *Id.* If the court finds that, on balance, a plaintiff's disability would render him unqualified for safety reasons, then the court must consider whether the employer can "reasonably accommodate" the plaintiff so that he can perform "the essential functions" of the job in question. *Id.* at 1131 & 1131 n. 17, 107 S.Ct. 1123 (quoting 45 C.F.R. § 84.3(k) (1985)). Finally, whatever the district court's legal conclusion regarding a claim of disqualification due to safety concerns, the court must make explicit both its findings of fact and its application of the law, so as to allow meaningful appellate review. *See id.*

In this case, the district court found, without explanation, that Doe's HIV infection would pose only a "remote and theoretical" risk to psychoeducational students. R4-59 at 2. Based on this sole finding and "[c]onsidering the four factors delineated in" *Arline,* the district court relied on our opinion in *Martinez v. School Bd. of Hillsborough County,* 861 F.2d 1502, 1506 (11th Cir.1988), to hold that Doe is qualified to be a psychoeducation teacher. R4-59 at 3.

In *Martinez,* a school sought to segregate a mentally retarded child with AIDS from her classmates. Holding for the school, the district court in *Martinez* concluded that a " "remote theoretical possibility' of transmission" justified her total separation from other students. *Martinez,* 861 F.2d at 1506. On appeal, we reversed because the danger of transmission did not rise to the " "significant' risk level" required for the girl's exclusion from a regular classroom. *Id.* In reversing the district court, however, we did not simply direct entry of judgment for the disabled plaintiff. Instead, we observed that the district court had failed to make factual findings regarding all four of

7

the *Arline* factors (the district court had considered only the likelihood of transmission), and we remanded for further findings and an assessment of the overall risk. *See id.* at 1506-07.

In the present case, the district court has not made any factual findings that might enable us to engage in meaningful appellate review. As in *Martinez* and *Arline,* the district court has failed to explain or justify the factual determinations underlying its decision. It is not enough for the district court to invoke *Martinez* 's phrase regarding a " "remote theoretical possibility' of transmission". Instead, the district court should explain why it believes that the risk posed by Doe is "remote" and should make findings of fact with respect to the *Arline* factors.[7] Because the district court's factual findings are incomplete and its reasoning is unclear, we vacate the injunction and remand the case to the district court for such further proceedings as it deems necessary for entry of a more explicit rationale for its decision.[8]

---

[7]We do not mean to imply that we believe that Doe is not qualified. Because the district court has neither made sufficient findings of fact nor explained its legal reasoning, we are not able to assess whether Doe is "otherwise qualified" for a psychoeducation position.

[8]We are also concerned about the nature of the legal standards applied by the district court, as evidenced by its comments in the record. For example, during the School District's examination of a witness, the district court stated to the parties that it was confused about what should constitute relevant evidence and that it believed that the legal test for whether the School District had violated the ADA was simply whether the District had acted "reasonably." R7 at 502. When counsel for both parties attempted to assist the court, the following exchange ensued:

> PLAINTIFF'S COUNSEL: Your Honor, may I interject? I don't want you to get mad at me for saying this, but I just want to real quickly state for the record how the issue should be framed from the legal standpoint. The issue is not whether the school board acted reasonably, but rather did they make an employment decision on the basis of my client's disability, and was he otherwise qualified to stay at Shadow Rock or did he present a direct threat?
>
> COURT: You can call it whatever you want to, but the bottom line is what I said. Whether it's based on his qualifications or otherwise, it's whether they acted reasonably.

## B. WHETHER DOE'S TRANSFER CONSTITUTED AN ADVERSE EMPLOYMENT ACTION

Under the ADA, no covered employer may discriminate against a qualified person because of his disability. *See* 42 U.S.C. § 12112(a). More specifically, no covered employer may use the disability of an otherwise qualified person as an excuse for discrimination in hiring, promotion, discharge, compensation, training, or "other terms, conditions, and privileges of employment." *Id.* Thus, the ADA prohibits "a broad variety of adverse employment actions, whenever those actions are taken for a prohibited reason." *McNely v. Ocala Star-Banner Corp.,* 99 F.3d 1068, 1077 (11th Cir.1996). Although we have never thoroughly examined what constitutes "adversity," we have held that a transfer may sometimes constitute an adverse action under the ADA, *see id.* at 1078.

In this case, both parties agree that the School District transferred Doe to an interrelated classroom because of his HIV disability. The School District, however, argues that it has not unlawfully "discriminated" against Doe because an "objective," "reasonable" person in Doe's position would not have viewed the transfer as an adverse employment action. Doe, though, maintains that an employment action may be adverse for either objective or subjective reasons. Doe therefore contends that his transfer was adverse both because he has a deep, personal commitment to psychoeducational instruction and because he would have to undergo ten credit hours of instruction in order to obtain certification in interrelated teaching.

PLAINTIFF'S COUNSEL: Well, legally it's based on—

COURT: All right. You worry about that if I rule against you and you can take it up to the Eleventh Circuit.

*Id.* at 503. We would have preferred that the district court make a greater effort to ascertain the legal basis for Doe's action before it made evidentiary or other rulings.

9

In its order, the district court did not explicitly adopt either an objective or subjective standard, but instead simply stated, without explanation, that "Plaintiff's transfer to the interrelated resource program was an adverse employment action." R4-59 at 3, ¶ 6. It seems likely, however, that the district court implicitly adopted Doe's approach, since its only factual findings that might conceivably have supported this legal conclusion were that (1) Doe is not certified for interrelated teaching, (2) psychoeducation "has special meaning and significance to him," and (3) his transfer was involuntary. *Id.* at 1-2.[9]

Before assessing Doe's particular allegations, we must first determine the proper standard for evaluating his claims. As we noted above, our circuit has not previously examined whether a court should view an employment action from the subjective perspective of a particular plaintiff or the objective perspective of a "reasonable person." Our court has, though, considered allegations of "adverse employment actions" in a variety of contexts, as have our sister circuits. *See generally, e.g., H & W Contracting,* 102 F.3d at 523-24 (11th Cir.1996) (discussing adverse employment action in the ADA context); *Maddow v. Procter & Gamble Co.,* 107 F.3d 846, 852-53 (11th Cir.1997) (discussing same under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634); *Collins v. State of Illinois,* 830 F.2d 692, 702-704 (7th Cir.1987) (discussing same under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*). Both the ADEA and Title VII, for instance, use the same "terms and conditions" language to proscribe discriminatory employment practices. *Compare* ADEA, 29 U.S.C. § 623(a)(1), *and* Title VII, 42 U.S.C. § 2000e-2(a) *with* ADA, 42 U.S.C. § 12112(a). Moreover, our precedents interpreting these employment

---

[9]Although the district court gave no explanation in its order for its conclusion that the transfer was adverse, it did appear to state during the trial that its decision concerning adversity would turn on whether it found Doe's transfer to have been voluntary or involuntary. *See* R8 at 605.

discrimination laws have often relied on the same "adverse employment action" concept that is an essential element of a *prima facie* ADA case. *See, e.g., Maddow,* 107 F.3d at 852-53 (ADEA); *Collins,* 830 F.2d at 702-04 (Title VII).[10] We can assist our consideration of the adversity standard under the ADA, therefore, by looking to the broader experience of our court and others with employment discrimination law.

We begin our analysis of the law in this area by noting that we have found no case, in this or any other circuit, in which a court explicitly relied on the subjective preferences of a plaintiff to hold that that plaintiff had suffered an adverse employment action.[11] Of course, in most employment discrimination cases the issue of a plaintiff's subjective preference need not arise, because the plaintiff has alleged an employment action that would appear adverse to any reasonable person. Where a plaintiff has allegedly suffered termination, demotion, reduction in pay, loss of prestige, or diminishment of responsibilities, for example, a court normally has no cause to consider its standard for adversity; the relevant question in such cases is whether such patently adverse actions actually took place. *Cf., e.g., Eskra v. Provident Life and Accident Ins. Co.,* 125 F.3d 1406, 1412

---

[10]An "adverse employment action" is also an element of two broad types of *prima facie* discrimination cases: (1) a *prima facie* circumstantial case, *see Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir.1989), and (2) a *prima facie* retaliation case, *see Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1196 (11th Cir.1997).

[11]In *Collins,* a panel of the Seventh Circuit did note that the plaintiff had been "transferred away from a job she enjoyed." 830 F.2d at 704. The *Collins* court, however, appears to have based its determination that the plaintiff had suffered an adverse employment action on its finding that her employer had severely curtailed her job responsibilities. *See id.* Moreover, any intimation in *Collins* that a court should consider an employee's subjective preference would seem to have been abandoned by the Seventh Circuit in later cases such as *Williams v. Bristol-Myers Squibb Co.,* 85 F.3d 270, 274 (1996) (holding that a "*purely* lateral transfer" cannot be adverse), which we discuss below.

(11th Cir.1997) (considering a reduction in income, but not mentioning the plaintiff's subjective preferences, in ruling that a transfer was adverse).

Recognizing this lack of precedent, Doe urges us to rely on two EEOC regulations interpreting the ADA. *See* 29 C.F.R. §§ 1630.4, 1630.5 (1998). As Doe correctly notes, we defer to a federal agency's reasonable interpretation of a law that Congress has given it authority to administer. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984). The EEOC's regulations, however, are of no assistance in this matter, because they do not address whether we should use an objective or subjective test to determine whether discrimination has occurred. In 29 C.F.R. § 1630.4, the EEOC makes clear that an employer may not "discriminate on the basis of disability against a qualified individual with a disability in regard to ... [a] transfer." The EEOC's regulation, however, does not state whether this prohibition on discrimination encompasses both objectively and subjectively adverse actions. Section 1630.4, therefore, does not provide us with any more guidance than our own precedent establishing that a transfer may sometimes constitute an adverse employment action. *See McNely,* 99 F.3d at 1078 (holding that a transfer may be an adverse employment action). Similarly, 29 C.F.R. § 1630.5 forbids employers from limiting, segregating, or classifying an employee "in a way that adversely affects his or her employment opportunities," yet does not specify what constitutes an adverse effect. As to both section 1630.4 and section 1630.5, moreover, the EEOC's "interpretive guidance" provides no further help regarding whether we should employ an objective or subjective standard. *See generally* 29 C.F.R. Pt. 1630, App. §§ 1630.4, 1630.5 (1998).

Having determined that we are not bound to a subjective standard, we adopt an objective test: An ADA plaintiff must demonstrate that a reasonable person in his position would view the

12

employment action in question as adverse. In our view, this test best reflects our employment discrimination doctrine and precedents. First, although this court has never explicitly addressed the issue, our authorities do at least suggest an objective approach. In *National Cement Co. v. Federal Mine Safety and Health Review Comm'n,* 27 F.3d 526 (11th Cir.1994), we considered whether a company had violated the Mine Act, 30 U.S.C. § 815(c), when it transferred an employee who had refused to do what he claimed was unreasonably dangerous work. Because the employer had transferred the plaintiff to a higher paying job, we ruled that it had not taken an unlawful "adverse action," without considering whether the plaintiff might have had a subjective preference for his previous position. *See id.* at 534.[12] Moreover, we note that two district courts within our circuit have ruled, in retaliation cases, that "an employment action ... is not adverse merely because the employee dislikes it or disagrees with it." *Perryman v. West,* 949 F.Supp. 815, 819 (M.D.Ala.1996); *accord McCoy v. Macon Water Auth.,* 966 F.Supp. 1209, 1220 (M.D.Ga.1997). While these district court cases are not controlling, they are consistent with our court's previous observation that not "every unkind act" amounts to an adverse employment action. *Wu v. Thomas,* 996 F.2d 271, 273 n. 3 (11th Cir.1993) (per curiam). At the same time, it seems significant that no panel of this circuit has ever listed a plaintiff's particular subjective preference as a basis for its holding that a transfer was adverse.[13]

---

[12]Of course, we do not know whether the plaintiff in *National Cement* argued that his subjective preference was sufficient, alone, to establish that his transfer was adverse. For this reason, *National Cement* is not controlling precedent. This same caveat applies to the various other suggestive authorities discussed in this opinion, since we have no way to determine whether the issue of a subjective versus an objective standard was raised by the parties.

[13]*See generally Maddow,* 107 F.3d at 852-53 (holding a transfer to be adverse); *Eskra,* 125 F.3d at 1412 (same); *McCabe v. Sharrett,* 12 F.3d 1558, 1563-64 (11th Cir.1994) (same); *Baker v. Sears, Roebuck & Co.,* 903 F.2d 1515, 1519 (11th Cir.1990) (per curiam) (same); *see also*

13

Outside our own circuit, persuasive authority suggests even more strongly that we should use a reasonable person standard to determine whether a plaintiff has suffered an adverse employment action. The Seventh Circuit, in particular, has repeatedly declared that "a *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Williams,* 85 F.3d at 274; *see also Flaherty v. Gas Research Inst.,* 31 F.3d 451, 457 (7th Cir.1994); *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993); *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 885-86 (7th Cir.1989). "Otherwise," the Seventh Circuit has written, "every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams,* 85 F.3d at 274.[14] Thus, "not everything that makes an employee unhappy is an actionable adverse action." *See Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996).

Several other circuits, moreover, have agreed that a truly lateral transfer cannot be adverse. In *Montandon v. Farmland Industries,* for example, the Eighth Circuit found that an allegedly retaliatory transfer was not adverse because it "did not entail a change in position, title, salary, or any other aspect of his employment ....[,][h]owever unpalatable the prospect [of the transfer] may have been to him...." 116 F.3d 355, 359 (8th Cir.1997); *see also Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). Similarly, the Sixth Circuit has held that a nurse's transfer was not adverse because it did not entail a loss of pay, duties, or prestige, *see Kocsis v. Multi-Care*

---

*McNely,* 99 F.3d at 1078 (holding that an transfer can constitute an adverse employment action under the ADA).

[14]The *Williams* court also was concerned that, if purely lateral transfers were actionable, then "[t]he Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial." *Williams,* 85 F.3d at 274.

14

*Management, Inc.* 97 F.3d 876, 886 (6th Cir.1996), while the Ninth Circuit has written that a plaintiff's transfer amounted to "a subjective loss of job satisfaction rather than an adverse employment action," *see Horn v. County of San Diego,* No. 96-55610 (9th Cir.1997) (per curiam). *Accord Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 919 n. 3 (9th Cir.1996), *cert. denied,* --- U.S. ----, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997). At the same time, the Third Circuit has adopted *Smart* 's view that "not everything that makes an employee unhappy" constitutes unlawful retaliation. *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997) ("[R]etaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment into ... "adverse employment action.' "). Thus, "[t]he clear trend of authority is to hold that" a purely lateral transfer is not an adverse employment action. *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997).

Of course, these cases do not articulate a reasonable person standard, nor do they explicitly stand for the proposition that a court may not ever consider a plaintiff's subjective preferences in determining whether his transfer is "purely lateral."[15] Nevertheless, they are, at a minimum, consistent with the objective standard that we expressly adopt in this opinion. As in the Eleventh Circuit, all of the cases that have found a transfer to be adverse appear to have based their conclusions on objective factors. *See, e.g., de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Serv.,* 82 F.3d 16, 21 (2d Cir.1996) (transfer resulting in lessened prestige and

---

[15]Often, in fact, these cases appear to leave the door open to adversity based on some subjective preferences, through their use of language like that in *Smart* that "*not everything* that makes an employee unhappy is an actionable adverse action." *Smart,* 89 F.3d at 441 (emphasis added). Unlike the hypothetical "chip-on-the-shoulder employee" in *Williams,* Doe has a significant, and deeply held, special commitment to psychoeducation for severely disordered children. *Compare Williams,* 85 F.3d at 274. This case, therefore, takes us a step beyond these authorities.

15

professional growth);  *Torre v. Casio, Inc.,* 42 F.3d 825, 831 n. 7 (3d Cir.1994) (transfer to a dead-end job).  In other words, our sister circuits have only held transfers to be adverse where the transfers were objectively equivalent, at least to some degree, to demotions.

Beyond these precedents from our sister circuits, we can also look to related principles of employment discrimination law to find support for the proposition that our test for adversity should be an objective one.  Under the doctrine of "constructive discharge," for example, "[t]he general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer ... is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee."  *Young v. Southwestern Sav. and Loan Assoc.,* 509 F.2d 140, 144 (5th Cir.1975).  In assessing constructive discharge claims, we do not consider a plaintiff's subjective feelings about his employer's actions.  Rather, we determine whether "a reasonable person in [the plaintiff's] position would be compelled to resign." *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1317 (11th Cir.1989); *accord, e.g., Serrano-Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 26 (1st Cir.1997) ("We have long applied an "objective standard'...."); *Kelleher v. Flawn,* 761 F.2d 1079, 1086 (5th Cir.1985) ("[S]ubjective impressions as to the desirability of one position over another cannot control our decision.") (quoting *Lee v. Russell Cty. Bd. of Educ.,* 563 F.2d 1159, 1162 (5th Cir.1977)).  Applying this doctrine, Doe might have refused his transfer, resigned, and then sued for constructive discharge.  Had he done so, however, he would have had not only to meet a high threshold of adversity ("intolerability"); he would also have had to rely solely on objective factors to make his case.  Instead of quitting his job, though, Doe accepted the transfer and now seeks to prove that it was adverse through evidence of his personal preference for psychoeducational teaching.  While our constructive discharge

16

precedents by no means control our decision in this case, it would seem strange and inconsistent for us to apply an objective standard where a plaintiff rejects a transfer, resigns, and sues, but to apply a subjective standard where a plaintiff accepts a transfer and sues. Absent some justification for such a dichotomy, we decline to introduce such a confusing inconsistency into the law.

At the same time, our adoption of an objective standard for claims of an adverse employment action is consistent with our current use of objective standards regarding employers' claims and defenses. In the ADA context, for instance, we often inquire as to whether an employer has made a "reasonable accommodation" of its employee's disability. In making this determination, we do not ask whether an employer has made all the accommodations it feels are appropriate, or whether an employer has made all the accommodations that a disabled plaintiff desires. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir.1997). Instead, we decide whether a requested accommodation "would impose an undue hardship on the employer." *Id.* Similarly, we do not rely on an employer's "feelings" regarding a person's disability. *See H & W Contracting,* 102 F.3d at 524. Nor do we consider the subjective but unreasonable fear that a community may harbor regarding teachers with HIV. *Cf. Martinez,* 861 F.2d at 1505-06 (reversing an order segregating a child with AIDS from her classmates); *Arline,* 480 U.S. at 284, 107 S.Ct. at 1129 (disregarding "society's accumulated myths and fears about disability and disease").[16]

Moreover, we have employed the adverse employment action concept as a means to avoid requiring plaintiffs to prove the *subjective,* discriminatory intent of an employer. Often, a plaintiff

---

[16]We also note that the Supreme Court has interpreted the "terms, conditions, or privileges of employment" language of Title VII to require a sexual harassment plaintiff to show that her work environment is *objectively* hostile. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

17

claiming unlawful employment discrimination cannot produce direct evidence of his employer's intent. *See Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1375 (11th Cir.1996). In order to allow plaintiffs to surmount this problem, the courts have articulated a set of elements that a plaintiff may prove to establish a circumstantial *prima facie* case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Mayfield,* 101 F.3d at 1375. As we explained above, one of the elements that a plaintiff must show to establish such a *prima facie* case is that he has suffered an adverse employment action. *See Carter,* 870 F.2d at 582. Were we to adopt Doe's subjective test for adversity in this case, we would create an odd situation in which a plaintiff could use the *McDonnell Douglas* test not only to avoid having to prove directly his employer's discriminatory intent, but also to force his employer to either disprove the plaintiff's own subjective feelings or concede an element of the plaintiff's *prima facie* case.[17] Though, again, the *McDonnell Douglas* line of cases is not controlling, we are hesitant to introduce unnecessary inconsistency and confusion into employment discrimination law.[18]

---

[17]For instance, consider a case in which a school involuntarily transferred a female teacher from a seventh grade to an eighth grade class and then placed a male in her former position. Even without direct evidence that the school harbored a gender-discriminatory intent, the teacher could establish a *prima facie* circumstantial case by showing that (1) she was a member of a protected class (women), (2) she was qualified to teach the seventh grade class, (3) her transfer was an adverse employment action, and (4) a member of an unprotected class filled her former position (the male teacher). *Cf. Carter,* 870 F.2d at 582. (stating the elements of a *prima facie* circumstantial case). Under Doe's view, the teacher's subjective preference for her former seventh grade class would be sufficient to prove that she had suffered an adverse employment action, so the school would have either to produce evidence that she did not subjectively prefer her former position or to concede this element. Thus, the *McDonnell Douglas* test would excuse employees from producing direct evidence of their employers' subjective intent but would *require* employers to produce such evidence of their employees' subjective preferences.

[18]In addition to rendering one element of the *McDonnell Douglas* test essentially moot, a subjective standard would make the law less predictable for employers. Under an objective standard, an employer can expect that it will not be liable for employment discrimination if it

18

Returning more specifically to the ADA context, we also note that our requirement that a plaintiff must show, as part of his *prima facie* case, that he has suffered an adverse employment action would be essentially meaningless if we were to utilize a subjective standard. In order for an honest plaintiff to go to the trouble of suing his employer, he must be unhappy with some action that his employer has taken. Given this basic fact, a subjective standard would mean that no court would ever seriously consider the adverse employment action prong of a *prima facie* ADA case—we could just assume this element to be satisfied in every case. Even if we did not assume away the adversity requirement as a matter of course, a plaintiff could always prove this part of his case by testifying that he was unhappy with whatever employment action had brought him into court; an employer could rarely rebut its employee's statement of his own subjective feelings.

Finally, we believe that the standard that we articulate today will well serve the ADA's goal of eliminating discrimination on account of disability. *See generally* 42 U.S.C. § 12101 ("Findings and purpose"). By evaluating claims from the perspective of a reasonable person in the employee's position, we will continue to interpret the ADA to prohibit a wide range of job actions based on an employee's disabled status. Transfers that result in lesser pay, responsibilities, or prestige[19] will still

does not constrain its employees' careers. Under a subjective standard, however, an employer cannot anticipate which employment actions a court will find to be adverse, because it cannot always know what will make its employees "unhappy."

[19]In at least two cases, the Seventh Circuit has stated or implied that loss of prestige did not make a transfer adverse. *See Flaherty,* 31 F.3d at 457; *Spring,* 865 F.2d at 886. It is somewhat unclear in these cases whether the court was holding that a loss of prestige was outweighed by other factors, was not significant, or was irrelevant. *See Flaherty,* 31 F.3d at 457; *Spring,* 865 F.2d at 886. Regardless, we believe that loss of prestige, either within an organization or with regard to the general public, is an objective factor that a court should consider as part of the reasonable person test. *Cf. de la Cruz,* 82 F.3d at 21. Beyond the loss of prestige itself (a reasonable if egoistic employee goal much like salary or promotion), diminishment of prestige may also affect an employee's marketability, another significant objective factor.

19

be "adverse." *See, e.g., Baker* 903 F.2d at 1519 (lesser pay); *Collins,* 830 F.2d at 704 (lesser responsibilities); *de la Cruz,* 82 F.3d at 21 (lesser prestige). So, too, will transfers that involve arduous travel or that impede an employee's professional growth or advancement. *See, e.g., Maddow,* 107 F.3d at 852 (travel); *de la Cruz,* 82 F.3d at 21 (professional growth); *Torre,* 42 F.3d at 831 n. 7 (advancement). In other words, our reasonable person standard will continue to protect disabled employees from transfers that are a form of demotion or that disrupt investment in education, training, or seniority.

Turning to the specific facts of the present case, we are unable to determine from the current record whether Doe has suffered an adverse transfer. As we have explained, Doe's subjective preference for a psychoeducation position is not relevant to our inquiry. Although we greatly admire Doe's commitment to teaching such tragically disordered children, we do not consider the special meaning that he ascribes to his former job.

The question that remains, then, is whether a reasonable person in Doe's position would have viewed as adverse the requirement that Doe complete ten credit hours (over three years) to obtain certification in interrelated teaching. To support his argument that this transfer-induced obligation is adverse, Doe cites *Rodriguez v. Board of Educ. of Eastchester Union Free Sch. Dist.,* 620 F.2d 362 (2d Cir.1980). In that Title VII case, a school district allegedly transferred a female, middle school, art teacher to an elementary school as part of its policy of segregating female art teachers into elementary education. *See id.* at 364-66. Prior to her transfer, the teacher had not only had twenty years of experience in teaching middle school art classes but had also received a doctoral degree in art education; her doctoral thesis was entitled "A Model Arts Program for the Middle School of Eastchester School District Number 1." *See id.* After examining the school district's

action, the *Rodriguez* court concluded that the teacher had suffered an adverse transfer because "substantially uncontradicted evidence indicated that the art programs at the elementary level were so profoundly different from those in the junior high school as to render utterly useless her twenty years of experience and study in developing art programs for middle school children." *Id.* at 366. This "severe professional ... trauma," the court held, constituted an adverse, sex-based interference with a condition or privilege of employment. *See id.*

The facts of Doe's case, however, are quite different. Unlike the plaintiff in *Rodriguez,* Doe's transfer does not substantially obviate a specialized education; Doe does not have a bachelor's or higher degree that is less applicable to interrelated education than it is to psychoeducation. Although Doe's transfer would disrupt his investment in his current Georgia certificate, his transfer from a psychoeducational to an interrelated classroom is not nearly as dramatic as Rodriguez's move from a middle school to an elementary school.[20] In other words, Doe may not have suffered the "severe *professional* trauma" evident in *Rodriguez,* though his transfer undoubtedly represented a "*personal* " setback.

Still, Doe does not need to show that his transfer would represent a "severe trauma" to a reasonable person in his position. Instead, he needs only to show that his transfer was, on the whole, objectively adverse. Any adversity must be material; it is not enough that a transfer imposes some *de minimis* inconvenience or alteration of responsibilities.[21] *See Crady,* 993 F.2d at 136. Moreover,

---

[20]Although not mentioned in the *Rodriguez* opinion, such a transfer from a middle to an elementary school might also be thought to involve a significant loss of prestige, and perhaps long-term prospects for advancement in the art education field as well.

[21]It is important not to make a federal case out of a transfer that is *de minimis,* causing no objective harm and reflecting a mere chip-on-the-shoulder complaint. However, it is equally important that the threshold for what constitutes an adverse employment action not be elevated

the fact that an employee must learn as a result of a transfer does not mean that the transfer is *per se* adverse. *See Williams,* 85 F.3d at 274. In *Williams,* for example, the court held that a salesman's transfer to a different product line was not adverse, despite the fact that he had to learn more new products than he would have if he had stayed put. *See id.* (concluding that the salesman's loss of commission income while he learned about new products did not render his transfer adverse). As the *Williams* court observed, all transfers require some learning, since they require employees to work with new people or products and to assume new responsibilities. *See id.* Thus, any coursework requirements for Doe must rise to a level that a reasonable person would deem materially adverse, taking into account both the pros and cons of such required education.

In sum, Doe must demonstrate that a reasonable person in his position would have found his transfer to be adverse under all the facts and circumstances. Unfortunately, the district court has not made sufficient findings with regard to any of these factors for us to undertake a meaningful review. Therefore, we have decided to remand the case to the district court for such proceedings as it deems necessary for it to enter explicit findings of fact concerning the allegedly adverse nature of Doe's transfer.[22] Once having made these explicit findings, the district court should clearly explain why

---

artificially, because an employer's action, to the extent that it is deemed not to rise to the level of an adverse employment action, is removed completely from any scrutiny for discrimination. In other words, where the cause or motivation for the employer's action was clearly its employee's disability, a finding that the action does not rise to the level of an adverse employment action means that the action is not scrutinized for discrimination. An artificially high threshold for what constitutes an adverse employment action would undermine the purposes of the statute by permitting discriminatory actions to escape scrutiny. We believe that the purposes of the statute are appropriately served by requiring the fact finder to determine whether a reasonable person would consider the action adverse under all the facts and circumstances.

[22]The district court should make relevant subsidiary findings of fact, as well as an ultimate finding of fact as to whether a reasonable person in Doe's position would have found the transfer to be adverse under all the facts and circumstances. Without in any way limiting the subject

22

it believes that a reasonable person in Doe's position would or would not have found the transfer to have been an adverse employment action.

In determining whether Doe's transfer was adverse, the district court should not rely on its determination that the transfer was involuntary. In saying this, we do not mean to disturb the district court's finding on this issue but rather to make clear that the voluntary or involuntary nature of the transfer is not relevant to the question of whether it was unlawfully adverse. Of course, a finding that Doe's transfer was purely voluntary would have been dispositive in the School District's favor; a transfer cannot be "because of a disability" if it occurred as the result of an employee's own request. *Cf. Stewart v. Board of Trustees of the Kemper County Sch. Dist.,* 585 F.2d 1285, 1289 (5th Cir.1978) (voluntary transfer not unlawful under Title VII); *Hooper v. Maryland,* No. 94-1067 (4th Cir.1995); *Devine v. Thalhimers,* No. 92-1084 (4th Cir.1992). The fact that Doe's transfer was involuntary, however, does not in any way establish that it was legally adverse. *Cf. Williams,* 85 F.3d at 274 (finding an "involuntary" transfer to be non-adverse). If a reasonable person in Doe's position would have viewed the transfer as non-adverse, the district court should not consider Doe's subjective, personal preference for his prior position.

### III. CONCLUSION

matter of appropriate findings, the following would seem to be relevant: what is entailed in the coursework required for certification in the new position; would such additional certification increase Doe's career opportunities, and, if so, was such additional certification and resulting increase in opportunities available to Doe in any event, or was this available to Doe only because of the transfer; whether the District's action would in effect limit Doe's opportunities in this school district to the teaching of interrelated classes, and/or foreclose other opportunities, and, if so, whether the same would adversely affect Doe's employment opportunities or status within either this particular school district or the field of special education generally, *see* 29 C.F.R. Pt. 1630, App. § 1630.5 (1998); and considering all of the relevant subsidiary findings, whether a reasonable person in Doe's position would consider the transfer to be adverse.

23

We review in this case an injunction under the ADA that prohibits the School District from transferring Doe out of the District's psychoeducation program because of his infection with HIV. To establish a *prima facie* case under the ADA, Doe must prove that he has a disability; that he is otherwise qualified to teach psychoeducation, with or without some reasonable accommodation; and that he has suffered an adverse employment action because of his HIV status (*i.e.,* that the School District has discriminated against him because of his disability).

To determine whether Doe is qualified, the district court should have found and weighed the four factors explained in *Arline.* The district court, however, failed to make explicit findings of fact regarding any dangers that Doe's illness might pose to violent psychoeducation students. In addition, the district court erred by applying a subjective standard for determining whether Doe's transfer was adverse. Moreover, because the district court did not enter explicit findings of fact or conclusions of law with regard to those aspects of Doe's transfer that might render it objectively adverse, we believe that it would be imprudent for us to attempt to assess whether the School District subjected Doe to an adverse employment action.

Therefore, we REVERSE the district court's judgment, VACATE the injunction, and REMAND the case to the district court for further proceedings consistent with this opinion.